UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:25-cv-03188-JVS-JDE | Date | August 18, 2025 |
| Title | Masimo Corporation v. Joe E. Kiani et al | | |

Present: The Honorable **James V. Selna, U.S. District Court Judge**

| | |
|---|---|
| Elsa Vargas | Not Present |
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:** **[IN CHAMBERS] Order Regarding Motions to Dismiss [118, 121]**

While the case was pending in the Southern District of New York, Defendants Roderick Wong, Naveen Yalamanchi, RTW Investments, LP, RTW Investments GP, LLC, RTW Master Fund, Ltd., RTW Offshore Fund One, Ltd., RTW Onshore Fund One, LP, RTW Innovation Master Fund, Ltd., RTW Innovation Offshore Fund, Ltd., RTW Innovation Onshore Fund, LP, and RTW Fund Group GP, LLC (collectively, "RTW Defendants") filed a motion to dismiss Plaintiff Masimo Corporation's ("Masimo") First Amended Complaint or, in the alternative, transfer the case to the Central District of California. (Mot., Dkt. No. 118.) Masimo filed an omnibus opposition. (Opp'n, Dkt. No. 134.) RTW Defendants replied. (Reply, Dkt. No. 135.)

For the following reasons, the Court **DENIES** RTW's motion to dismiss, and denies the motion to transfer as moot. (Mot., Dkt. No. 118.)

Defendant Joe E. Kiani ("Kiani") filed a similar motion to dismiss (Dkt. No. 121), but Masimo voluntarily dismissed Kiani under Rule 41(a). (Notice, Dkt. No. 194.) Accordingly, Kiani's motion to dismiss is **MOOT**. (Dkt. No. 121.)

## I. BACKGROUND

The following facts are taken from the First Amended Complaint ("FAC"). (First Amended Complaint, Dkt. No. 100.)

### *A. Factual Background*

#### 1. Relevant Parties

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:25-cv-03188-JVS-JDE | Date | August 18, 2025 |
| Title | Masimo Corporation v. Joe E. Kiani et al | | |

Masimo is a medical technology company, incorporated in Delaware and headquartered in Irvine, CA. (FAC ¶ 17.) Politan Capital Management ("Politan"), a hedge fund, is one of Masimo's largest shareholders. (Id. ¶ 31.)

Joe E. Kiani ("Kiani") is the founder of Masimo, where he was the CEO from 1989 to 2024. (Id. ¶¶ 18, 30.) The RTW Defendants are Masimo investors who have a "deep relationship" with Kiani. (Id. ¶¶ 19–29, 34.)

2. Proxy Contest and Empty Voting

Masimo alleges that shareholders lost confidence in Kiani's leadership. (Id. ¶ 30.) At the June 2023 annual meeting, Politan gained two of the five board seats, defeating Kiani's slate. (Id. ¶ 31.) The following year, in March 2024, Politan nominated two other candidates to run against Kiani and his nominee, who were to be elected at the July 25, 2024, annual meeting ("July Annual Meeting"). (Id. ¶ 32.)

Masimo alleges that to save his seat in the 2024 proxy contest, Kiani "colluded" with RTW Defendants. (Id. ¶¶ 1, 34.) More specifically. Masimo claims that because RTW Defendants originally had only a 2.8% stake in Masimo, they engaged in an "empty voting" scheme in order to artificially inflate RTW Defendants' voting power. (Id. ¶ 39.) RTW Defendants increased their shares to 9.9% by June 13, 2024 ("June Record Date"), and with Kiani's 9.1%, held together 19% of Masimo's securities. (Id. ¶¶ 41–46, 50.) Masimo alleges that RTW Defendants "took on no additional economic risk" when their position spiked by approximately three million shares prior to the June Record Date because they were short selling—they borrowed shares from BlackRock and "sold short an equivalent number of shares to offset any economic risk that came from increasing its long position." (Id. ¶¶ 4, 54–58.)

Masimo claims that, presumably, from around April 3, 2024, up to the July Annual Meeting, Kiani colluded with RTW Defendants to execute their empty voting scheme. (Id. ¶¶ 47–48, 52.) By doing so, they effectively formed an undisclosed Section 13(d) group and became a statutory insider, violating Regulation Fair Disclosure ("FD") and Section 16 of the Securities Exchange Act. (Id. ¶¶ 45–46, 53, 93–96, 104–111.) For instance, Kiani was allegedly in constant communication with RTW Defendants, providing them with confidential information, such as the record date before the

information was publicly available, or sending a photo of a whiteboard listing the voting totals for shareholders. (Id. ¶¶ 47–49, 59–64.) Masimo avers that RTW Defendants could not have tripled their shares between May 23 and June 13, 2024, had they not known about the record date. (Id. ¶ 50.) Masimo further alleges that Kiani and RTW Defendants operate as a group to this day. (Id. ¶ 97.)

On July 1, 2024, both Kiani and RTW Defendants voted early in Kiani's favor. (Id. ¶¶ 68–69.) Empty voting occurred because between the June Record Date and June 30, 2024, RTW Defendants covered their short position by buying stocks at a lower price than their selling price, and disposing of 4.3 million shares to bring their position back down to 2.8%. (Id. ¶¶ 65–67.)

After empty voting, RTW Defendants contacted Glass, Lewis & Co. ("Glass Lewis"), a leading independent proxy advisory firm that issues voting recommendations to shareholders, representing that they had 9.9% of Masimo's shares and supported Kiani's nominees. (Id. ¶¶ 6, 79–80.) However, on July 13, 2024, Glass Lewis issued a report that did not recommend Kiani's nominees. The report noted the inconsistency between RTW's representation and its public filings, which showed they were a 2.8% shareholder, and that "[i]f additional materials corroborating Politan's concerns subsequently emerge, . . . [Glass Lewis] would view such circumstances as a highly inappropriate manipulation of the shareholder franchise and a severe indictment of Masimo's credibility and corporate governance." (Id. ¶¶ 80–83.) Institutional Shareholder Services ("ISS"), another proxy advisory firm, concurred with Glass Lewis' recommendation in favor of Politan's nominees. (Id. ¶ 82.)

After two leading proxy advisor firms recommended against Kiani's nominees, Kiani called a Board meeting on July 15, 2024, resetting the record date from June 13, 2024, to August 12, 2024, and moving the July Annual Meeting from July 25, 2024, to September 19, 2024 ("September Annual Meeting"). (Id. ¶ 84.) Again, Kiani and RTW Defendants allegedly engaged in a similar empty voting scheme that they had executed in July, and voted in favor of Kiani's slate on the same day. (Id. ¶¶ 85–92.) However, RTW Defendants allegedly revoked their votes, then re-voted for Kiani on September 17, 2024. (Id. ¶ 89.)

After Politan discovered evidence of empty voting, the General Counsel informed Politan that the Board would convene to discuss Politan's letter raising concerns

regarding Kiani and RTW Defendants. (Id. ¶¶ 70–72.) However, according to Masimo, there was no genuine investigation into Kiani's involvement, including any review of his corporate email account, telephone records, or off-channel messaging applications. (Id. ¶ 77.)

3. Masimo Corporation v. Politan Capital Management

The Court is also well aware of the proxy fight that ensued between Kiani-controlled Masimo and Politan in the days leading up to the September Annual Meeting. In July 2024, Masimo filed an action against Politan and Politan's directors for their misstatements in proxy materials and for violating fiduciary duties. (See First Amended Complaint, Masimo Corporation v. Politan Capital Management et al, Case No. 8:24-cv-01568-JVS-JDE.) In a sealed order, the Court denied Masimo's motion for a preliminary injunction enjoining Politan from voting any proxies solicited under Section 14(a) or Rule 14a-9 until corrective disclosures were made. (Order, Dkt. No. 201.) Politan issued a press release disclosing the contents of the Court's order before the release of a public version on the docket in order to influence the shareholder vote, violating the Court's order. (Order, Dkt. No. 219.) The Court held Politan and one of its principals, Quentin Koffey,[1] in contempt and imposed a monetary sanction of $1. (Id.; Order, Dkt. No. 292.) The Court is aware that by winning the proxy contest, Politan is now essentially on both sides of two lawsuits.

4. Post Proxy Contest

On September 19, 2024, Politan's nominees were elected, and Kiani immediately tendered his resignation. (Mot. at 13.) By September 30, 2024, RTW Defendants again disposed of their shares. (FAC ¶ 90.)

On October 25, 2024, Masimo filed this action, seeking Kiani and RTW Defendants' compliance with Section 13(d) of the Securities Exchange Act and RTW's disgorgement of their short-swing profits pursuant to Section 16(b) of the Securities Exchange Act. (Id. ¶ 13.)

[1]The Court later withdrew the contempt citation for Koffey on procedural grounds.

After Masimo initiated this action, RTW Defendants sought to inspect Masimo's books and records as filing this lawsuit "call[ed] into question whether . . . directors are fulfilling their fiduciary duties." (Declaration of Warren Koshofer ("Koshofer Decl."), Dkt. No. 120 ¶ 13, Ex. L.) According to Kiani and RTW Defendants, this lawsuit belies Masimo's true intention to avoid paying Kiani more than a $450 million severance package.[2] (Mot. at 2.) Contrarily, Masimo alleges that the demand was "deficient on its face." (FAC ¶¶ 98–99.) Masimo denied RTW Defendant's demand and refused to produce any documents. (Id. ¶ 98.)

*B. Procedural Background*

Masimo filed this action in the Southern District of New York on October 25, 2024, against Kiani and RTW Defendants. (Complaint, Dkt. No. 1.) Masimo filed its FAC on December 30, 2024. (FAC.) Kiani and RTW Defendants filed their motions to dismiss in January 2025. Both motions seek to dismiss the complaint under Rule 12(b)(6), *forum non conveniens*, or in the alternative, transfeAugust 19, 2025r the venue to the Central District of California. (Kiani Mot. at 22; RTW Mot. at 36.) The case was subsequently transferred to this Court on April 15, 2025. On August 4, 2025, Masimo voluntarily dismissed Kiani under Rule 41(a). (Notice, Dkt. No. 194.)

## II. LEGAL STANDARD

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. A plaintiff must state "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim has "facial plausibility" if the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In resolving a Rule 12(b)(6) motion under Twombly, the Court must follow a two-pronged approach. First, the Court must accept all well-pleaded factual allegations as true, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere

[2]The parties are pending litigation regarding the enforceability of Kiani's golden parachute provision in the Delaware Court of Chancery and California Superior Court. (FAC ¶ 99.)

conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. Most succinctly stated, a pleading must set forth allegations that have "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Courts must "accept as true all well-pleaded allegations of material fact, and construe them in the light most favorable to the non-moving party." Daniels-Hall v. Nat'l Educ. Ass'n, 629 F.3d 992, 998 (9th Cir. 2010) (citation omitted). Courts also "are not bound to accept as true a legal conclusion couched as a factual allegation." Id. (quoting Twombly, 550 U.S. at 555). "In keeping with these principles[,] a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id. at 679.

Second, assuming the veracity of well-pleaded factual allegations, the Court must "determine whether they plausibly give rise to an entitlement to relief." Id. at 679. This determination is context-specific, requiring the Court to draw on its experience and common sense, but there is no plausibility "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." Id.

## III. Discussion

The FAC brings two claims: (1) Violation of Exchange Act Section 13(d) for failure to file Schedule 13D, and (2) Violation of Exchange Act Section 16(b) for failure to disgorge short-swing profits. (See FAC.) Masimo also dismissed the Section 13(d) claim. (Stipulation, Dkt. No. 195.) As such, the Court only takes up RTW Defendants' motion as to the Section 16(b) claim in the FAC.

Section 16(b) of the Securities and Exchange Act of 1934 "imposes a strict prophylactic rule with respect to insider, short-swing trading." Foremost-McKesson, Inc. v. Provident Sec. Co., 423 U.S. 232, 251 (1976). It requires disgorgement of short-swing profits earned within six months by a beneficial owner of more than ten percent, "without proof of actual abuse of insider information, and without proof of intent to profit on the basis of such information." 15 U.S.C. § 78p (b); Kern Cnty. Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 595 (1973). Thus, to successfully bring an insider-trading Section 16(b) claim, Masimo must plead (1) a purchase and (2) a sale of securities (3) by a beneficial owner who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period. Simmonds v. Credit Suisse Sec. (USA) LLC, 638 F.3d 1072, 1087 (9th Cir. 2011); 15 U.S.C. § 78p(a), (b).

The Exchange Act does not define "beneficial owner." However, for Section 16 purposes, the term "beneficial owner" has "two applications: one to determine who is subject to Section 16 and another to determine what holdings and transactions must be reported and subject to short-swing profit recovery." Feder v. Frost, 220 F.3d 29, 32–34 (2d Cir. 2000) (citing Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 34–28869, 56 Fed. Reg. 7242 (Feb. 21, 1991)). First, to determine who is subject to Section 16 and has insider status as a ten percent shareholder, beneficial owner means "any person who is deemed a beneficial owner pursuant to section 13(d) of the Act and the rules thereunder." 17 C.F.R. § 240.16a-1; see Morales v. Quintel Ent., Inc, 249 F.3d 115, 122 (2d Cir. 2001). Next, to determine what transactions must be reported under Section 16, a plaintiff must demonstrate the beneficial owner "directly or indirectly, . . . has or shares a direct or indirect pecuniary interest in the equity securities" so traded. 17 C.F.R. § 240.16a–1(a)(2).

### A. *Beneficial Owners as a "Group" under Section 13(d)*

First, the Court must determine whether RTW Defendants fall within the definition of beneficial owners under Section 13(d). To address whether RTW Defendants are "beneficial owners," the Court looks to the definition of beneficial ownership under Section 13(d). Morales, 249 F.3d at 122–24. In its promulgation of Rule 13d-5, the SEC defined beneficial ownership by a group as

> [w]hen two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the [Exchange] Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons.

17 C.F.R. § 240.13d–5(b)(1). "The touchstone of a group within the meaning of Section 13(d) is that the members combined in furtherance of a common objective"—a common objective of either acquiring, holding, voting, or disposing of securities. Wellman v.

Dickinson, 682 F.2d 355, 363 (2d Cir. 1982); Dreiling, 578 F.3d at 1002 (citing Morales, 249 F.3d at 124). "The agreement may be formal or informal and may be proved by direct or circumstantial evidence." Morales, 249 F.3d at 124 (citations omitted). The concerted action "need not be expressly memorialized in writing." Wellman, 628 F.2d at 363.

RTW Defendants contend that the FAC provides no more than conclusory allegations that Kiani and RTW Defendants formed a "group" for the purposes of Section 13(d). (Mot. at 17–24.) The Court disagrees. The Court notes that there is no controlling precedent in the Ninth Circuit regarding what constitutes a group under the relevant statute. Nevertheless, Masimo makes sufficient allegations of "circumstantial evidence" in the FAC to defeat a motion to dismiss. Morales, 249 F.3d at 124.

Masimo presents three categories of conduct that demonstrate RTW Defendants' concerted action to affect the corporate election. First, Masimo claims that Kiani and RTW Defendants had an existing relationship "that goes far beyond RTW's investment with Masimo." (FAC ¶ 34.) For instance, Kiani's family trust of approximately $6.7 million as of June 30, 2024, is in RTW Innovation Onshore Fund, one of the RTW Defendants. (Id.) Furthermore, Kiani has a close personal relationship with Naveen Yalamanchi ("Yalamanchi"), the partner and portfolio manager at RTW, and Roderick Wong, RTW's founder and management partner. (Id. ¶¶ 36–37.) Personal or business relationships, on their own, do not establish the existence of a group. Nano Dimension Ltd. v. Murchinson Ltd., 681 F. Supp. 3d 168, 182 (S.D.N.Y. 2023), aff'd, 102 F.4th 136 (2d Cir. 2024); Forward Indus., Inc. v. Wise, 2014 WL 6901137, at *3 (S.D.N.Y. Sept. 23, 2014). However, there is more than mere personal relationships between Kiani and RTW Defendants. On March 31, 2024, Kiani emailed a draft of a confidential press release about Politan's nominations for the Board election, saying "Please don't trade on anything until this is out. . . ." (FAC ¶¶ 43–44.) Yalamanchi allegedly responded with "extensive comments" to the draft, which were incorporated into the final announcement. (Id.) Although emails regarding the press release are insufficient to form a group, such interaction taken in furtherance of each other's business interests indicates that Kiani and RTW's principal have more than a "mere relationship." Transcon Lines v. A. G. Becker Inc., 470 F. Supp. 356, 375 (S.D.N.Y. 1979) (citation omitted).

Second, Masimo claims that Kiani and RTW Defendants were in continuous contact in the period leading up to the July Annual Meeting. Masimo provides a list of

the seventeen telephone calls and text messages, not including emails, that Masimo is aware of between Kiani, Wong, and Yalamanchi. (FAC ¶¶ 43–48.) From June 1 to July 11, 2024, Kiani and Yalamanchi communicated, on average, once every four days. (Id. ¶ 48.) The numerous correspondences, particularly around June 13, the first record date, to July 15, the date the Board convened to move the record date and the annual meeting, do not indicate that there were only "sporadic communications" between Kiani and RTW Defendants. Cf. meVC Draper Fisher Jurvetson Fund I, Inc. v. Millennium Partners, L.P., 260 F. Supp. 2d 616, 632 (S.D.N.Y. 2003) (finding that a "sporadic" record of communications between companies, six messages between executives with large gaps in between, does not support the existence of a group). Contrary to meVC, where the court found that communications following a major public event are not suspicious, here, the communications occurred prior to the relevant dates. See id. While RTW Defendants claim that some lasted less than a minute and most were messages scheduling calls (Mot. at 21), they suggest there may have been more calls between the relevant dates.

RTW Defendants respond that the SEC's amendments to beneficial ownership reporting also do not support a finding of a group.

> In our view, a discussion whether held in private, such as a meeting between two parties, or in a public forum, such as a conference that involves an independent and free exchange of ideas and views among shareholders, alone and without more, would not be sufficient to satisfy the "act as a . . . group" standard in sections 13(d)(3) and 13(g)(3).

Modernization of Beneficial Ownership Reporting, 88 FR 76896-01 (Nov. 7, 2023).[3] Yet, there is more than a simple "exchange of ideas" as shareholders here. Id. The photograph of a whiteboard listing the shareholding percentage of the major shareholders sent to Yalamanchi is particularly revealing. (See FAC ¶¶ 59–64.) The photo contains confidential information about vote totals, showing that Kiani was aware

[3] Masimo argues that Defendants improperly rely on SEC's guidance since the Supreme Court's overturning of the Chevron deference. (Opp'n at 31.) While agency interpretations are more scrupulously examined by courts in the wake of Loper Bright Enterprises v. Raimondo, 603 U.S. 369 (2024), they may still guide courts in coming to a determination.

that RTW held 10% and BlackRock had 9%, whereas the most recent Schedule 13F report indicated that each held 2.8% and 16%, respectively. (Id.)

RTW Defendants claim that the FAC is plagued with "unwarranted deductions of fact, or unreasonable inferences[,]" such as this picture of the whiteboard as evidence of coordinated activity among Defendants. (Aug. 11, 2025 Hr'g Tr. at 14) (citing Daniels-Hall, 629 F.3d at 998.) They argue, for instance, that because the FAC alleges that Innisfree M&A Inc. ("Innisfree") provided non-public information that the shares were from BlackRock, it would be unreasonable to infer that RTW Defendants told Kiani this information. Not so. These two allegations are not mutually exclusive—both RTW Defendants and Innisfree could have provided confidential information on shareholders' positions.

More importantly, Kiani "texted" the photo of the whiteboard to one of the RTW Defendants, suggesting existing communication of non-public information among the relevant parties prior to the Record Date. (FAC ¶ 59.) At a minimum, this communication suggests that Kiani was confident that RTW had 9.9% and would have its support. At most, it is a strong indicia of a common goal to execute an empty voting scheme, which was essential to Kiani's victory. RTW Defendants also contend that the photo cannot be evidence of collusion because they already possessed their voting power before Kiani sent the photo, which was after the record date. (Mot. at 22–23.) However, the Court notes that this argument is less persuasive given that the Kiani-controlled Board moved the record date two weeks later. Since this Court construes Masimo's allegations "in the light most favorable to the non-moving party," Daniels-Hall, 629 F.3d at 998, it finds the record lends credence to an existence of a group.

Third, allegations of RTW Defendants' empty voting scheme also support a shared objective among Kiani and RTW Defendants to win the election for board seats. For instance, after the record date, RTW Defendants decreased their shares from 9.9% back to 2.8% by June 30, 2024. (FAC ¶ 65.) They did so again for the rescheduled record date, increasing their position to 9.9% and back down to 2.2% after the August 12 record date. (Id. ¶ 85.) In addition to the empty voting scheme and offsetting their short position not to take on economic risk, Kiani moved the record and annual date after two proxy advisory firms issued a report indicating support for Politan's nominees. (Id. ¶ 83.) Further, RTW Defendants and Kiani allegedly voted their shares on or around the same day, on two separate occasions—on July 1, before the first annual meeting, and on

August 21, before the rescheduled annual meeting. (Id. ¶¶ 68, 86–88.)

RTW Defendants contend that there are "compelling financial reasons" for voting in favor of Kiani. (Mot. at 20.) They claimed to have voted for Kiani because if Politan were to take over, it would trigger the "poison pill": Kiani's $450 million severance package and potential loss of an exclusive licensing agreement. (Id.) Even so, its legitimate reasons for voting in favor do not invalidate the allegations that they acted as a group. Rather, the economic rationale for voting in favor of Kiani indicates that Kiani and RTW Defendants had a "common objective" of acquiring, holding, and voting securities in order to keep Kiani on the Board. Wellman, 682 F.2d at 363; Dreiling, 578 F.3d at 1002.

RTW Defendants further argue that Masimo's own proxy filings between July and September 2024 disprove allegations of a group. (Mot. at 23–24.) The filings indicate that Masimo twice investigated RTW Defendants' relationship with Kiani. (Id.; Koshofer Decl. Ex. H.) However, Masimo responds that these statements were made when Kiani still controlled the Board, and thus, it later "disavow[ed] them." (FAC ¶¶ 75–78.) Moreover, the investigations were allegedly superficial and lacking any review of Kiani's email account, phone records, or messaging apps. (Id.)

While no single communication or RTW Defendants' action on its own is sufficient to show they acted as a group,, the totality of the "circumstantial evidence"—RTW Defendants' pre-existing relationship with Kiani, various communications particularly around July Record Date to the rescheduled annual meeting, and Defendants' pattern of voting—allows the Court to draw the reasonable inference of an informal agreement among Kiani and RTW Defendants to acquire shares in order to keep Kiani on the Board. See Wellman, 628 F.2d at 363. Accordingly, the Court finds RTW Defendants and Kiani formed a group, and were beneficial owners of more than ten percent of Masimo's stock for the purposes of Section 16(b).

*B. Rule 9(b)*

The second issue is whether the heightened pleading standard in Rule 9(b) applies to claims for violation of Section 13(d). RTW Defendants contend that the heightened pleading standard should apply because Masimo's FAC is sound in fraud. (Mot. at 16.) A claim that does not require a showing of fraud may still apply the Rule 9(b) pleading

standard if the claim is "grounded in" or "sound in" fraud or mistake. Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1103 (9th Cir. 2003). While courts have yet to determine whether Rule 9(b) applies to Section 13(d) claims[4], the Ninth Circuit applied a heightened pleading standard to complaints alleging "a unified course of fraudulent conduct and rely[ing] *entirely* on that course of conduct as the basis of a claim." Vess, 317 F.3d, at 1103 (emphasis added).

Here, it is not entirely evident that the FAC relies solely in fraud. The FAC indeed includes words such as "scheme," "secretly colluded," and "secretly manipulate," which are often associated with fraud claims. (FAC ¶ 1.) It also alleges that RTW Defendants have misled shareholders by failing to disclose their true voting power. (Id. ¶¶ 38–41.) Though the FAC may run fairly close to being sound in fraud, the crux of the complaint remains the Defendants' failure to disclose their block acquisitions under Section 13(d) disclosure requirements. This conclusion is further supported by the broad statutory language and the legislative intent of the statute. Section 13(d) requires an existence of a group, nothing more. The broad language reflects congressional intent to "alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control" and "prevent evasion of the disclosure requirement." Morales, 249 F.3d at 122–23. And despite amendments regarding Section 13(d), neither the SEC nor Congress has provided any further guidance on the requisite level for pleading 13(d) claims, not brought as a plaintiff class action. See, e.g., Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78a et seq. (heightening the pleading requirements for "each private action arising under this chapter that is brought as a plaintiff class action").

Even if the Court were to apply Rule 9(b), the Court finds that Masimo has sufficiently pleaded RTW Defendants' activities to meet the heightened pleading standard. A fraud claim must be accompanied by "the who, what, when, where, and how" of the fraudulent conduct charged. Vess, 317 F.3d at 1106 (quoting Cooper, 137 F.3d at 627). "A pleading is sufficient under rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the

[4]Defendants rely on Nano Dimension to argue that Rule 9(b) applies. The case is distinguishable in that the claims were subject to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which requires a heightened pleading standard. 681 F. Supp. 3d at 179; 15 U.S.C. §§ 78u-4(b)(1). Masimo's claims are not subject to the PSLRA.

allegations." Moore v. Kayport Package Express, Inc., 885 F.2d 531, 540 (9th Cir. 1989). Statements of the time, place, and nature of the alleged fraudulent activities are sufficient, but mere conclusory allegations of fraud are not. Id. Furthermore, though allegations based on information and belief are usually insufficient, in circumstances of corporate fraud, this rule may be relaxed as to matters within the opposing party's knowledge. Id.

Here, allegations regarding the claim that RTW Defendants acted as a group with Kiani are accompanied by who, what, when, where, and how. See Vess, 317 F.3d at 1106; (FAC). RTW Defendants do not argue that the FAC lacks such information or what more it can provide regarding the circumstances of fraud. In fact, FAC identifies sufficient circumstances surrounding the proxy fight for RTW Defendants to find "logical discrepancies" in the allegations. (Reply at 17.) Furthermore, though RTW Defendants repeatedly claim that the FAC "lacks facts supporting its claim[s]," (Reply at 17), they rely on the wrong standard. In a motion to dismiss, the Court accepts "all well-pleaded" allegations as true, and construes such allegations "in the light most favorable to the non-moving party." Daniels-Hall, 629 F.3d at 998 (citation omitted). "Facts" are better left for a motion for summary judgment.

*C. Pecuniary Interest and Group Pleading*

RTW Defendants argued at oral argument that the FAC includes improper group pleading as to the pecuniary interest element of Section 16(b). RTW Defendants relied on Huppe v. Guez, which found that "if the group member does not have or share a pecuniary interest in securities held by other group members, the transactions of the other group members do not create Section 16 obligations for that member." WL 8154782, at *7 (C.D. Cal. Apr. 18, 2005) (citing Ownership Reports and Trading By Officers, Directors and Principal Security Holders, 56 Fed. Reg. 7242, at 7235.) According to RTW Defendants, since the FAC only alleges that only two Master Funds engaged in some trading of Masimo stock during the relevant period, all RTW Defendants with the exception of the two Master Fund Defendants should be dismissed. (August 11, 2025 Hr'g Tr., at 4–12.)

Despite prior opportunities to raise this argument regarding Masimo's Section 16(b) claim, RTW Defendants failed to do so in their moving papers or through

supplemental briefing.[5] See Twin Rivers Eng'g, Inc. v. Fieldpiece Instruments, Inc., 2018 WL 6038277, at *6 n.4 (C.D. Cal. Apr. 24, 2018) ("Because this new issue was raised for the first time at the hearing and was not addressed in the parties' briefing, the Court also declines to consider this new argument."); Ramirez v. Salvation Army, 2006 WL 1867722, at *9 (N.D. Cal. July 6, 2006) ("[T]he Court need not consider an issue ... raised for the first time at oral argument."). Nevertheless, the Court briefly addresses the argument.

The Court agrees with Masimo that at this time, it cannot ascertain which defendants made short-swing profits because all RTW Defendants failed to make any Section 13(d) or 16 filing and only reported their aggregate quarterly holdings on Form 13. (Opp'n at 37; FAC ¶ 110.) What Masimo knows is that their aggregate holdings increased from 9.9% and later covered its position. (FAC ¶¶ 54–57.) Thus, at a motion to dismiss stage, Masimo is entitled to allege, based on available information and belief, that RTW Defendants who collectively filed Form 13 partook in the short-swing profits.

Further, group pleading may be permissible "so long as group pleading is limited to defendants who are similarly situated." Bassam v. Bank of America, 2015 WL 4127745, at *7 (C.D. Cal. July 8, 2015) (citing In re American Apparel, 2012 WL 9506072, at *41). Although RTW Defendants argued during the hearing that all defendants must be "similarly situated as to liability," the FAC again meets the test. (Aug. 11, 2025 Hr'g Tr. at 9.) Succinctly, Masimo claims that RTW Defendants collectively engaged in an empty voting scheme and profited from their short sales. (See FAC ¶ 108–109) (alleging matchable purchases and sales made by RTW Defendants). Accordingly, the Court finds group pleading appropriate because the allegations against one RTW Defendant can be imputed to every other RTW Defendant, providing fair notice to all RTW Defendants.

*D. Six-Month Period*

Finally, the Court finds that the FAC satisfies the six-month period element of a Section 16(b) claim. For the June Record Date, RTW Defendants allegedly made large

[5]Parties had ample time to seek supplemental briefing after the case was transferred to this Court last October, and the motion to dismiss, which was filed November 2024.

block trades from May 23, 2024, through June 5, 2024, then sold their stock by June 30, 2024. (FAC ¶¶ 55, 65.) Again, for the August Record Date, RTW Defendants allegedly executed trades to build its position back up to 9.9% and down to 2.8% position within the span of 42 days. (Id. ¶ 85.)

Because the Court finds that RTW Defendants formed a group with Kiani (see supra Section III.A.1.), and the FAC alleges that Defendants made purchases and sales within a six-month period between May 23, 2024, and September 19, 2024, all elements of Section 16(b) are properly pled in the FAC. (FAC ¶¶ 107–109.) Accordingly, the motion is denied as to the Section 16(b) claim.

## IV. Conclusion

For the foregoing reasons, the Court **DENIES** the motion. The parties shall further abide by this district's local rules for future filings.

**IT IS SO ORDERED.**